# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### November 10, 2009 Session

## STATE OF TENNESSEE v. TERANCE ROSE

**Direct Appeal from the Criminal Court for Shelby County**
**No. 07-04461     David G. Hayes, Judge, By Designation**

---

**No. W2008-02214-CCA-R3-CD  - Filed May 20, 2010**

---

The defendant, Terance Rose, stands convicted of reckless homicide, a Class D felony, and especially aggravated robbery, a Class A felony.  The trial court sentenced him as a Range I standard offender to three years for reckless homicide and twenty years for especially aggravated robbery.  On appeal, the defendant argues that (1) the trial court erred in allowing the state to amend the indictment over the defendant's objection, (2) the sheriff's deputies violated his Fourth Amendment right to be free from unreasonable searches, and (3) the deputies took his third statement in violation of his Sixth Amendment right to counsel. Following our review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

J.C. MCLIN, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and ROBERT W. WEDEMEYER, JJ., joined.

Claiborne H. Ferguson, Memphis, Tennessee, for the appellant, Terance Rose.

Robert E. Cooper, Jr., Attorney General and Reporter; Clarence E. Lutz, Assistant Attorney General; William L. Gibbons, District Attorney General; and Damon Griffin and Theresa McCusker, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

### Background

This case arises from the March 2007 murder of Christopher Smith.  Based on this offense, in May 2007, a Shelby County grand jury indicted the defendant, Terance Rose, and his co-defendant, Charles Williams, for first degree murder in the perpetration of a felony

and especially aggravated robbery. At the defendant's trial in August 2008, the parties presented the following evidence.

Jonathan Smith, the victim's younger brother, testified that, on March 10, 2007, the victim had Mr. Smith's cell phone because he was out of minutes on his own phone. The victim picked Mr. Smith up from his job around 7:00 p.m. They returned to their home on Macon Hall Road, and the victim returned Mr. Smith's phone to him. Mr. Smith went to his sister's birthday party around 8:00 p.m., without the victim. Around 10:30 p.m., he received a phone call from a person calling himself "Markese," who asked for "Smitty." Mr. Smith testified that "Smitty" was the victim's nickname. Mr. Smith did not know a "Markese," but he recognized the caller's voice as being that of the defendant, whom he knew from school. After speaking with "Markese," Mr. Smith called the victim. The victim had previously told Mr. Smith that he wanted to know when someone called from that phone number because "they was [sic] trying to buy some weed from him." When Mr. Smith spoke with the victim, between 10:30 and 10:45 p.m., the victim told him that he would be home later. "Markese" called again after 12:00 a.m. on March 11, 2007, and said, "Tell Smitty to meet us on the trail." Mr. Smith did not speak to or see the victim again.

On the morning of March 11, 2007, Mr. Smith learned that his brother had been killed. Law enforcement officers questioned him at his house. After they were finished, Mr. Smith walked to 1153 Sanbyrn Drive, where the defendant was staying with Brandon and Anthony Johnson, their sister, Sheronda Burks, and their parents. The defendant, the Johnson brothers, and Ms. Burks were standing outside. Mr. Smith told them that his brother had been killed and that he thought the defendant had called him the night before as "Markese." The defendant denied that he called. After speaking with them for fifteen to twenty minutes, the defendant, the Johnson brothers, and Ms. Burks left the residence in a car. They told Mr. Smith that they were going to a barbeque in North Memphis, and Mr. Smith walked home. When he returned home, law enforcement officers asked him if he knew anyone who had a blue Charger, and he responded that Ms. Burks had a blue Charger. He told the officers where Ms. Burks lived and that she, her brothers, and the defendant had just left to go to a barbeque.

On cross-examination, Mr. Smith testified that the victim had sold drugs to Anthony Johnson at Mr. Johnson's house. Mr. Smith indicated the location of "the trail" on a photograph of his neighborhood. He did not call the victim to tell him that "Markese" wanted to meet him at the trail. Mr. Smith did not know Charles Williams.

Percell Duckett testified that he lived in the Woodland Hills area of Cordova. Between 6:30 a.m. and 7:00 a.m. on March 11, 2007, he was walking his dog on a trail near Woodland Hills Drive when he saw the victim's body and a pistol lying near his body. He immediately turned around and went home to call the authorities.

Deputy William Franks, with the Shelby County Sheriff's Office, testified that he responded on March 11, 2007, to a call in Cordova of a man down, who was possibly armed. He and three other deputies arrived at Mr. Duckett's house, and they went to the trail where Mr. Duckett had seen the body. Deputy Franks said a gray car was parked near the scene. When they arrived at the scene, another deputy kicked the pistol away from the body because they were unable to determine if the man was alive. Once they observed no movement, they realized he was deceased and called the General Investigations Bureau ("GIB") of the Sheriff's Office. Deputy Franks roped off the area to secure the scene. No one else was present other than law enforcement officers until an ambulance crew arrived.

Sergeant Robert Butterick, a detective with the Shelby County Sheriff's Office, photographed and collected the evidence at the crime scene. He testified that he found a compact disc case with a set of digital scales inside and a Ruger P95 nine millimeter handgun near the victim. The gun's chamber and magazine well were both empty, and its safety was on. He found the gun's magazine, containing nine rounds of nine millimeter jacketed hollow point bullets, "several feet" away from the gun. Sergeant Butterick recovered two bullets from gouges in the ground, both .380 caliber. He also collected one fired .380 shell casing on the side of the trail away from the body and two fired .380 shell casings on the trail itself. Sergeant Butterick processed the compact disc case, the handgun, the magazine, and the nine-millimeter bullets for fingerprints but found none.

Detective Jason Ellis Bartlett, of the Shelby County Sheriff's Office, testified that he was assigned to the Street Crimes Unit. He explained that officers with the Street Crimes Unit did not wear uniforms and drove "regular vehicles." His supervisor, Sergeant Helms, assigned him to support the GIB on March 11, 2007, by following up on leads in the investigation of the victim's homicide. Sergeant Helms informed him that the defendant was a person of interest, and they had information that he was in North Memphis, near Lyndale Avenue and North Hollywood Street, with a blue Dodge Charger. Another officer found the Charger on Lyndale Avenue. When Detective Bartlett arrived, several people were in the immediate vicinity of the Charger, having "some type of cook out." He recognized the defendant as one of those people because he had a photograph of the defendant. Detective Bartlett approached the defendant and "conducted an officer pat down for safety, due to the nature of the crime, as being a person of interest for a homicide." When conducting the pat-down, Detective Bartlett felt a "soft bulge" in the defendant's right front pocket that he considered to be "consistent with being some sort of narcotic being packaged" based on his experience, and he asked the defendant what it was. The defendant told him it was marijuana. When Detective Bartlett requested that the defendant remove the marijuana from his pocket, the defendant complied. The marijuana was packaged into five small bags. Detective Bartlett detained the defendant because of the marijuana and advised the defendant of his *Miranda* rights. He also handcuffed the defendant, pursuant to department policy, because his vehicle did not have a cage. He then transported the defendant to the GIB at 201

Poplar Avenue. Detective Bartlett testified that he turned the marijuana into the property room, and property room personnel weighed it. The total weight of the marijuana was ten grams.

Sergeant Kevin Helms testified that he was the sergeant over the Shelby County Sheriff's Office Street Crimes Unit in March 2007, but he worked in the private sector at the time of trial. He assisted the GIB in the investigation of the victim's death. Sergeant Helms spoke with the victim's brother, Jonathan Smith, and his stepfather. Based on information he received, he developed the defendant as a suspect. Mr. Smith informed him that the defendant had just left the neighborhood in a blue Dodge Charger. Sergeant Helms found an address on Lyndale Avenue through an investigative database that was associated with 1153 Sanbyrn Drive. When he arrived at Lyndale Avenue, he spoke with Sheronda Burks. She indicated she would cooperate with the investigation, and he rode with her in her Charger to the GIB where she spoke with investigators.

Based on statements made by the defendant to other deputies, Sergeant Helms went to 1153 Sanbyrn Drive on the evening of March 11, 2007, to recover the murder weapon and the defendant's clothes. He found a Jennings .380 caliber pistol hidden inside insulation in the attic area located adjacent to a make-shift bedroom where the defendant and the Johnson brothers slept. Sergeant Helms testified that the gun had one round in the chamber and two rounds in the magazine. He also found the shirt that the defendant had worn earlier that day in his bedroom. Another officer collected the shirt to be processed for gunshot residue and DNA.

Dr. Karen Chancellor, the Chief Medical Examiner for Shelby County, testified that Dr. Lisa Fonte, an assistant medical examiner, performed an autopsy of the victim on March 11, 2007. Dr. Fonte determined that the cause of the victim's death was a homicide, and the manner of death was a gunshot wound to the right buttock. Dr. Fonte recovered a bullet from the body. Dr. Chancellor testified that the bullet entered the victim's right buttock and traveled upward, perforating the victim's intestines and blood vessels. Dr. Chancellor identified a picture of the bullet that Dr. Fonte recovered, and she described the bullet as having a copper jacket and lead hollow point. Dr. Chancellor testified that the victim tested negative for alcohol but positive for "T.H.C. . . . the active metabolite in marijuana." Dr. Fonte did not find any powder stippling on the victim's body or clothes, and Dr. Chancellor testified that the gun was not very close to the victim when fired. She estimated that the victim died at some point in the eighteen hours prior to his autopsy, based on the temperature of the body at the time of the autopsy.

On cross-examination, Dr. Chancellor testified that personnel in her office took swabs of each of the victim's hands for gunshot residue analysis by the Tennessee Bureau of Investigation.

Special Agent Laura Hodge, a forensic scientist with the Tennessee Bureau of Investigation ("TBI"), testified that she analyzed the swabs that the medical examiner's office took of the victim's hands. She determined that the results were inconclusive, meaning that some amount of the elements comprising gunshot primer were present but did not reach the threshold level for the results to be conclusive. Agent Hodge further testified that she tested gunshot residue kits from the defendant and Charles Williams. As to Mr. Williams, "elements indicative of gunshot residue were absent." As to the defendant, "[e]lements indicative of gunshot residue were inclusive." Agent Hodge said the results for the three kits could not "eliminate the possibility that the individual could have fired, handled, or was near a gun when it fired." She testified that the passage of time affected the results of a gunshot residue test because "any activity that a person does from the time of the incident until the time the kit is collected . . . increases the likelihood that . . . gunshot residue will not retain on the hands." Agent Hodge further testified that Sergeant Chris Harris brought three gunshot residue kits to the TBI for testing.

Sergeant Chris Harris, of the Shelby County Sheriff's Office, testified that he was the case officer who investigated the victim's death. He responded to the location of the victim's body on March 11, 2007, and stayed there until he received information that the victim's brother, Jonathan Smith, had information about the case. Sergeant Harris learned from Mr. Smith that the victim had planned to meet a subject, "Markese," for a narcotics transaction and that the subject had called Mr. Smith's phone. Mr. Smith recognized the subject's voice and identified him as the defendant. Sergeant Harris instructed officers to go to the residence where the defendant was staying. He also followed up on the phone number from which "Markese" called and learned that the number was a cell phone registered to Sheronda Burks. Based on cell tower activity, the cell phone company determined that the phone was near Lyndale Avenue on the afternoon of March 11. Officers took the defendant into custody when they located him on Lyndale Avenue and brought him to Sergeant Harris's office at 201 Poplar Avenue around 4:00 p.m. Sergeant Harris testified that Sheronda Burks, Anthony Johnson, and Brandon Johnson were also present at 201 Poplar Avenue. Sergeant Harris was responsible for taking evidence from the medical examiner's office and the property room at 201 Poplar Avenue to the TBI laboratory. That evidence consisted of "two handguns, shell casings, bullet fragments, clothing, . . . the victim's fingerprints, their fingernail clippings and DNA . . . ." He also sent gunshot residue kits to the TBI, which contained swabs that Sergeant Butterick took of the defendant and Charles Williams's hands and that the medical examiner's office took of the victim's hands.

Sergeant Harris conducted the questioning of the defendant, and Sergeant Helms and Sergeant Sides were also present. Early in the interview process, he advised the defendant of his *Miranda* rights. He interviewed the defendant twice on March 11, 2007. In the defendant's first statement, he claimed he threw his gun into a pond after fleeing the scene. In the defendant's second statement, the defendant said the gun was in the house on Sanbyrn

Drive. Sergeant Harris identified two advice of rights documents signed by the defendant. The defendant signed one prior to giving his first statement, and he signed the second form prior to giving his second statement. The officers recorded both statements, and a transcriptionist later reduced the statements to writing. Officers recovered a weapon and clothing at the Sanbyrn Drive residence based on the defendant's second statement. On March 13, 2007, Sergeant Harris spoke to the defendant in jail, told him that Charles Williams was in custody, and asked if the defendant wished to clear up discrepancies in their statements. The defendant subsequently came to Sergeant Harris's office, signed a third advice of rights form, and gave another statement. The state published all three statements to the jury.

On cross-examination, Sergeant Harris testified that he was aware the defendant had marijuana on his person when Detective Bartlett arrested him, but he did not appear to be under the influence of marijuana or anything else at the time of the first interview. The defendant stated that he had the marijuana to smoke and to sell. Sergeant Harris did not recall whether he asked the defendant if he had been smoking, but he did ask whether he was on any medication or had been drinking. Sergeant Harris testified that he did not believe the defendant was the shooter, but the defendant supplied Charles Williams with the gun. He agreed that the defendant, in his first statement, claimed the shooting was in self-defense. Sergeant Harris testified that the defendant and Charles Williams took two ounces of marijuana from the victim and then split it between themselves. The defendant had ten grams with him when Officer Barlett arrested him. Sergeant Harris testified that a friend of the victim, "Jaman," called the victim's cell phone after midnight but "was unable to make contact."

Sheronda Burks testified that the defendant lived with her family at 1153 Sanbyrn Drive for approximately three months in 2007, and he was living there on March 11, 2007. The defendant slept in Brandon Johnson's bedroom on the second floor of the home. Ms. Burks testified that the defendant was with her family on March 10, 2007 while they were visiting her grandmother. They left her grandmother's house around 10:00 p.m. When she awoke on March 11, 2007, the defendant had her cell phone, which she let him use frequently. The defendant asked her to tell police that she had let someone at Berryhill Market borrow her phone, and he used the name "Markese." She heard the defendant say that he robbed someone, and he mentioned "three shots." The defendant accompanied Ms. Burks's family to her grandmother's house again on March 11, 2007. While they were at her grandmother's house, sheriff's deputies approached them about the victim's murder. She, her brothers, and the defendant went to 201 Poplar Avenue to answer questions. Deputies returned Ms. Burks to her home, and she showed them where Brandon Johnson's bedroom and the adjoining attic were. The deputies recovered a gun in the attic, and they took a jacket that Ms. Burks saw the defendant wearing the day before.

On cross-examination, Ms. Burks testified that she saw Charles Williams "that day" at her grandmother's house, but she did not know him. One of her brothers and the defendant knew him. She did not know whether the defendant left the house the evening of March 10, 2007, because after they returned from her grandmother's house, she stayed in her bedroom. Ms. Burks testified that she originally told the sheriff's deputies the story about "Markese" that the defendant had asked her to tell. She further testified that the defendant was not speaking to her when she overheard him say that he robbed someone, and she only heard parts of his conversation.

Special Agent Cervinia Braswell, a forensic scientist for the TBI, testified that the two bullets recovered from the crime scene and the bullet recovered from the victim's body were each fired from the Jennings .380 pistol that the sheriff's deputies recovered from 1153 Sanbyrn Drive. She further testified that the magazine that deputies found at the crime scene fit the Ruger nine millimeter pistol that they also recovered at the crime scene. Agent Braswell said that the Ruger pistol would eject cartridge cases "seven to twelve feet off to the right." According to Agent Braswell, an individual could not fire the Ruger pistol if the safety was on. Additionally, the Ruger had magazine releases on either side of the pistol that, when pushed, would allow a magazine loaded with cartridges to fall out under its own weight.

On cross-examination, Agent Braswell testified that she did not realize that one of the live .380 cartridges that she received from the Shelby County Sheriff's Office was a reference bullet and not a part of the crime scene.

After the close of proof and deliberations, the jury returned its verdicts finding the defendant guilty of the lesser-included offense of reckless homicide, a Class D felony, and especially aggravated robbery, a Class A felony. The trial court sentenced him as a Range I standard offender to three years for reckless homicide and twenty years for especially aggravated robbery. The defendant filed a timely notice of appeal.

**Analysis**

*I. Amendment of the Indictment*

As his first issue, the defendant argues that the trial court erred by allowing the state to amend the indictment over his objection. Specifically, the defendant contends that the change in the indictment from "with the intent to commit First Degree Murder" to "with the intent to commit Robbery" charged a different *mens rea*. Additionally, the defendant alleges that the original indictment affirmatively misled him as to the state's theory. The state responds that the trial court did not err by allowing it to correct a typographical error in the indictment.

The grand jury indicted the defendant, in Count One, for felony murder. The original indictment read:

> [The defendant] between March 9, 2007, and March 12, 2007, in Shelby County, Tennessee, and before the finding of this indictment, did unlawfully and with the intent to commit First Degree Murder kill CHRISTOPHER SMITH during the perpetration of Especially Aggravated Robbery, in violation of T.C.A. 39-13-202, against the peace and dignity of the State of Tennessee.

On the first day of trial, prior to jury selection, the state moved the court for permission to amend the indictment to replace "First Degree Murder" with "Robbery." The trial court allowed the amendment, over the defendant's objection, finding that the language of the indictment provided sufficient notice of the charge and that there was no prejudice to the defendant.

An indictment must "state the facts constituting the offense in ordinary and concise language, without prolixity or repetition, in a manner so as to enable a person of common understanding to know what is intended and with that degree of certainty which will enable the court, on conviction, to pronounce the proper judgment." Tenn. Code Ann. § 40-13-202. To satisfy our constitutional notice requirements, an indictment must provide notice of the offense charged, an adequate basis for the entry of a proper judgment, and suitable protection against double jeopardy. *State v. Hill*, 954 S.W.2d 725, 727 (Tenn. 1997). An indictment need not conform to strict pleading requirements. *Id*.

The Tennessee Supreme Court continues to emphasize the relaxation of common law pleading requirements, as well as its reluctance to promote form over substance in examining the sufficiency of an indictment. *See State v. Hammonds*, 30 S.W.3d 294, 300 (Tenn. 2000). Indictments which satisfy the requirements for adequate notice to the defendant also satisfy constitutional and statutory requirements. *Id*. For example, an indictment which refers to the statute defining the offense is sufficient both to provide a defendant with notice and to satisfy constitutional and statutory requirements. *State v. Sledge*, 15 S.W.3d 93, 94 (Tenn. 2000). Furthermore, an indictment alleging all elements of an offense is sufficient even though it does not allege the specific theory upon which the prosecution intends to rely to prove each element. *State v. Lemacks*, 996 S.W.2d 166, 172 (Tenn. 1999). In addition, this court has previously observed that "a felony murder indictment must allege that the killing was committed during the perpetration of a felony, but specific allegations of the elements and facts of the underlying felony are unnecessary." *State v. Alfonzo E. Anderson*, No. W2000-00737-CCA-R3-CO, 2002 WL 1558491, at *2 (Tenn. Crim. App., at Jackson, Jan. 9, 2002) (citations omitted). Additionally, the requisite mental state may be inferred from the conduct alleged in the felony murder indictment. *Sledge*, 15 S.W.3d at 95 (concluding "that recklessness, knowledge, or intent may be inferred from the conduct alleged in the

indictment - that the defendant unlawfully killed [the victim] during the perpetration of the aggravated robbery.")

Tennessee Rule of Criminal Procedure 7(b) states that a court may permit an amendment of the indictment, "[w]ithout the defendant's consent and before jeopardy attaches . . . if no additional or different offense is charged and no substantial right of the defendant is prejudiced."[1]  Tenn. R. Crim. P. 7(b).  In this matter, the state alleges that the indictment contained a typographical error.  Correction of an "unintentional drafting error" does not charge an additional or different offense nor prejudice a substantial right of the defendant if the indictment clearly charges the essential elements of the offense.  *State v. Beal*, 614 S.W.2d 77, 80 (Tenn. Crim. App. 1981).  The indictment here charged the defendant with killing the victim in the perpetration of especially aggravated robbery, which was sufficient language to provide notice to the defendant that he was charged with felony murder.  *See Sledge*, 15 S.W.3d at 95.  The defendant, however, argues that the inclusion of the phrase "with the intent to commit First Degree Murder" affirmatively misled him as to the state's theory, thereby depriving him of an opportunity to prepare an adequate defense.  In *State v. Hopper*, this court held that language in a felony murder indictment, which alleged that the defendant killed the victim "deliberately," was "mere surplusage" and did not mislead the defendant because the state did not have to prove that the killing was deliberate.  *Hopper*, 695 S.W.2d 530, 535 (Tenn. Crim. App. 1985).  Another panel of this court concluded that "an indictment is not defective because of the inclusion of surplusage if, after eliminating the surplusage, the offense is still sufficiently charged."  *State v. March*, 293 S.W.3d 576, 588 (Tenn. Crim. App. 2008).

In view of these precedents, we conclude that the language "with the intent to commit First Degree Murder" was surplus language and that the indictment sufficiently provided the defendant with notice of the charged offense without the surplusage.  Additionally, amending the language to read "with the intent to commit Robbery" did not change the charged offense because the essential elements of felony murder - (1) an unlawful killing and (2) in the perpetration of a felony - remained unaffected.  The original indictment could not have misled the defendant because the offense was adequately charged without the surplus language; therefore, the trial court did not err in allowing the state to amend the indictment to correct a typographical error in the surplus language.  The defendant is without relief as to this issue.

## II. Suppression of Statements

For his second issue, the defendant argues that the trial court erred in denying his motion to suppress his statements and evidence found based on those statements.

---

[1] Jeopardy attaches when the jury is sworn.  *State v. Pennington*, 952 S.W.2d 420, 422 (Tenn. 1997).  The record is clear that the state moved for the amendment prior to jury selection.

Specifically, he contends that sheriff's deputies illegally searched him, that the illegal search led to an illegal arrest, and that the subsequent statements made by the defendant and the weapon seized as a result of the statements should be excluded as fruits of the poisonous tree. Additionally, he contends that Sergeant Helms obtained his third statement in contravention of his Sixth Amendment right to counsel. The state responds that the trial court properly ruled that the sheriff's deputies had a reasonable, articulable suspicion supporting the officer-safety pat-down and that the defendant waived his right to counsel.

### A. Suppression Hearing

The testimony at the suppression hearing, as it relates to this issue was as follows. Detective John Tremmel, of the Shelby County Sheriff's Office Street Crimes Unit ("SCU"), testified that he was one of the officers on the scene when Officer Bartlett performed a pat-down of the defendant. According to Detective Tremmel, the SCU officers who were assisting in the investigation of the victim's death knew that the defendant was a "main suspect" and that no one had recovered the gun used to shoot the victim. The SCU officers went to Lyndale Avenue based on information that the defendant and other persons of interest, the Johnson brothers, were at a cookout at that location. Sergeant Harris, the case officer overseeing the investigation, instructed them to ask the defendant and the Johnson brothers to talk to the investigators at 201 Poplar Avenue. Detective Tremmel heard Detective Bartlett ask the defendant if he would come downtown, and the defendant agreed to talk to investigators. The officers proceeded to pat-down all three persons of interest for officer safety because the officers were driving civilian vehicles that had no protection for the officers. Detective Tremmel testified that the three men did not have weapons, but Detective Bartlett discovered marijuana on the defendant. As a consequence of finding the marijuana, Detective Bartlett handcuffed the defendant. The other officers did not handcuff the Johnson brothers. The officers transported the individuals separately, and the supervising officer rode downtown with Sheronda Burks in her Dodge Charger.

On cross-examination, Detective Tremmel testified that the defendant identified himself, and the officers had a prior photograph of him. He said that the five or six people in the yard on Lyndale Avenue did not exhibit any threatening behavior and were all cooperative. Detective Tremmel testified that the sole reason the officers patted down the defendant and the Johnson brothers was because they would be riding in the officers' vehicles. He said that when officers find contraband in the course of a pat-down, "more than likely we're going to take it out and not just leave it in there."

On re-direct examination, Detective Tremmel testified that he would pat-down any person who would be in his car, if he did not know the person. He said that pat-downs focus on pockets and waistbands. In response to a question by the court, Detective Tremmel said his routine was to perform a pat-down of anyone who would be riding in his vehicle, even when he drove a squad car.

-10-

Sergeant Chris Harris, of the Shelby County Sheriff's Office, testified that he lead the investigation of the victim's death. He developed the defendant as a suspect based on information from the victim's brother. When he sent the SCU officers to talk to the defendant and the Johnson brothers, he instructed the officers to get their information if they were unwilling to talk to investigators in the GIB. When the SCU officers brought the defendant to his office, Sergeant Harris uncuffed him. He gave the defendant food, beverages, and breaks. Sergeant Harris interviewed Ms. Burks and her brothers before interviewing the defendant. Sergeant Sides was also present during the defendant's interview. Sergeant Harris advised him of his *Miranda* rights because of the marijuana discovered by the officers. The defendant read the rights waiver form, and Sergeant Harris also read the form aloud. The defendant wrote on the form that he understood his rights and signed the form. He then indicated that he wished to make a statement. Sergeant Harris testified that he advised the defendant of his rights prior to asking him any questions about the homicide. He asked the defendant whether he was under the influence of anything, and the defendant responded in the negative. In his first statement, the defendant said that Charles Williams shot the victim in self-defense. After the first statement, Sergeant Harris said they did not have enough to hold the defendant. Sergeant Sides continued talking with the defendant after the defendant finished giving his first statement. The defendant began "opening up." He agreed to give a second statement "to clear up some of the untruths" in his first statement. Sergeant Harris advised him of his *Miranda* rights again, and the defendant signed a second rights waiver form. In his second statement, he told Sergeant Harris where his gun was located. Sergeant Harris testified that the defendant never asked for a lawyer nor indicated that he wished to stop speaking with the investigators. After the second statement, he arrested the defendant for second degree murder, and a crime scene officer uncovered the gun where the defendant said it would be. Sergeant Harris testified that the defendant gave a third statement on March 13, 2007, after officers had questioned Charles Williams. Sergeant Harris went to the jail and asked the defendant if he wanted to clear up discrepancies between his statements and those of Charles Williams. Sergeant Harris advised him of his rights, and he signed a third waiver form. The defendant did not request a lawyer. Sergeant Harris testified that he believed the defendant told the whole truth in his third statement.

On cross-examination, Sergeant Harris testified that he treated the victim's death as a homicide because of the location of the bullet wound. He recorded the defendant's statements on audio equipment, but he did not record the full interviews. Sergeant Harris testified that the defendant spent over twenty-four hours in jail between his second and third statements. Sergeant Harris agreed that he, and not the defendant, instigated the conversation leading to the third statement. He recalled that the court arraigned the defendant on the morning of March 13, 2007, and he gave his third statement that afternoon. After the third

-11-

statement, the district attorney general's office decided to charge the defendant with murder in the perpetration of a felony.[2]

The trial court issued a written order denying the motion to suppress, finding that the officer had "a reasonable, particularized and articulable set of facts justifying his search." In addition, the court found that the officer did not violate the defendant's Fourth Amendment rights by seizing the marijuana found in the course of the *Terry* stop. The court further found that the defendant had been advised of his Fifth Amendment rights by law enforcement personnel prior to each statement, that a general sessions judge advised him of his Sixth Amendment rights upon arraignment, and that the defendant freely and voluntarily waived both his Fifth and Sixth Amendment right to counsel.

## B. Standard of Review

Unless the evidence preponderates against them, the trial court's findings of fact in a suppression hearing will be upheld on appeal. *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996). "Questions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." *State v. Lawrence*, 154 S.W.3d 71, 75 (Tenn. 2005) (quoting *Odom*, 928 S.W.2d at 23). However, appellate review of a trial court's conclusions of law and application of law to facts on a motion to suppress evidence is a *de novo* review. *See State v. Nicholson*, 188 S.W.3d 649, 656 (Tenn. 2006); *State v. Walton*, 41 S.W.3d 75, 81 (Tenn. 2001). In evaluating a trial court's ruling on a suppression motion, this court "may consider the proof adduced both at the suppression hearing and at trial." *State v. Henning*, 975 S.W.2d 290, 299 (Tenn. 1998). "The party prevailing in the trial court is entitled to the strongest legitimate view of the evidence, as well as all reasonable and legitimate inferences that may be drawn from the evidence." *Id.*

## C. Search and Seizure

Both the Fourth Amendment to the United States Constitution and Article I, section 7 of the Tennessee Constitution protect individuals from unreasonable searches and seizures. These constitutional provisions are designed "to prevent arbitrary and oppressive interference with the privacy and personal security of individuals." *State v. Daniel*, 12 S.W.3d 420, 424 (Tenn. 2000) (quoting *INS v. Delgado*, 466 U.S. 210, 216 (1984)). Therefore, "[u]nder both

---

[2] The record of the suppression hearing appears to be incomplete because the trial court's written order denying the motion to suppress contains facts not evident from the testimony of Detective Tremmel and Sergeant Harris. The appellant, in this case the defendant, has the duty "to prepare a record which conveys a fair, accurate and complete account of what transpired in the trial court with respect to the issues which form the basis of the appeal." Tenn. R. App. P. 24(b). This court is precluded from considering issues when the record is missing relevant material. *State v. Ballard*, 855 S.W.2d 557, 560-61 (Tenn. 1993). However, we find that the record contains enough material relevant to this issue for our review to proceed.

-12-

the federal and state constitutions, a warrantless seizure is presumed unreasonable, and evidence discovered as a result thereof is subject to suppression unless the State demonstrates that the seizure was conducted pursuant to one of the narrowly defined exceptions to the warrant requirement." *Nicholson*, 188 S.W.3d at 656; *see also State v. Binette*, 33 S.W.3d 215, 218 (Tenn. 2000). One such exception is a brief investigatory stop by a law enforcement officer if the officer has a reasonable suspicion, based upon specific and articulable facts, that a person has either committed a criminal offense or is about to commit a criminal offense. *Terry v. Ohio*, 392 U.S. 1, 21 (1968); *Binette*, 33 S.W.3d at 218. If the officer "has reason to believe that he is dealing with an armed and dangerous individual, regardless of whether he has probable cause to arrest the individual for a crime," the officer may conduct a limited pat-down search for weapons. *Terry*, 392 U.S. at 27; *see also State v. Crutcher*, 989 S.W.2d 295, 300 (Tenn. 1999).

In evaluating whether a police officer has a reasonable suspicion, supported by specific and articulable facts, a court must consider the totality of the circumstances. *U.S. v. Arvizu*, 534 U.S. 266, 273 (2002); *Binette*, 33 S.W.3d at 218. Those circumstances may include the personal observations of the police officer, information obtained from other officers and agencies, information obtained from citizens, and the pattern of operation of certain offenders. *State v. Watkins*, 827 S.W.2d 293, 294 (Tenn. 1992). Additionally, the court must consider any rational inferences and deductions that a trained officer may draw from those circumstances. *Id.* Reasonable suspicion is something more than an "inchoate and unparticularized suspicion or hunch." *Terry*, 392 U.S. at 27. While an officer's hunch is insufficient to justify an investigative stop, the likelihood of criminal activity required for reasonable suspicion is not as great as that required for probable cause and is less than would be needed to satisfy a preponderance of the evidence standard. *United States v. Sokolow*, 490 U.S. 1, 7 (1989).

The defendant contends that the SCU officers did not have a reasonable suspicion to justify stopping and frisking the defendant. Detective Tremmel testified at the suppression hearing that the SCU officers knew, based on information they received from other investigating officers, that the defendant was a suspect in a homicide and that the weapon used was still at-large. Detective Bartlett also testified that he knew the defendant was a suspect in a homicide. Additionally, both SCU detectives testified that they conducted pat-downs of the defendant and the Johnson brothers for their safety because they were driving civilian vehicles with nothing to protect them from passengers. Because the SCU officers testified to a reasonable, articulable suspicion that the defendant had participated in a homicide, we conclude that the investigatory stop was reasonable. *See Terry v. Ohio*, 392 U.S. at 21; *Binette*, 33 S.W.3d at 218. We further conclude that Detective Bartlett's initial pat-down of the defendant was reasonable because the officer knew that the weapon was at-large and because the defendant would be riding next to the officer in a pick-up truck, with

the only restraint being a seatbelt. *See Terry*, 392 U.S. at 27; *Crutcher*, 989 S.W.2d at 300; *see also State v. Winn* 974 S.W.2d 700, 703 (Tenn. Crim. App. 1998) (citing cases where "[a] frisk has been upheld as reasonable when the suspected crime might typically involve the use of a weapon").

The defendant further argues that Detective Bartlett's search of the defendant exceeded the scope of a *Terry* stop and frisk when he "went into [the defendant]'s pants pocket" and seized the marijuana. Officers are not required to ignore contraband discovered in the course of a valid frisk. *Minnesota v. Dickerson*, 508 U.S. 366, 375 (1993); *State v. Bridges*, 963 S.W.2d 487, 493 (Tenn. 1997). However, the defendant claims that the bulge in the defendant's pocket was not apparent as contraband. Under the "plain feel" doctrine, seizure of contraband is permissible if:

> 1) a prior valid reason exists for the intrusion, i.e., the patdown must be permissible under *Terry*; 2) the contraband is detected while the *Terry* search for weapons legitimately is still in progress; and, 3) the incriminating nature of the object perceived by the officer's sense of touch is immediately apparent giving the officer probable cause to believe the object is contraband prior to its seizure.

*Bridges*, 963 S.W.2d at 494. The "plain feel" doctrine, however, is inapplicable in this case because the defendant, upon Detective Bartlett's request, identified the bulge as marijuana and removed it from his pocket. At that point, the packaged marijuana was in plain view, and the officer had probable cause to seize the marijuana. *See State v. Cox*, 171 S.W.3d 174, 179 (Tenn. 2005). We conclude that the defendant's Fourth Amendment rights were not violated by the seizure of the marijuana. Consequently, the detention of the defendant based on the discovery of marijuana was lawful, and the evidence subsequently obtained was admissible. The defendant is without relief as to this issue.

### D. Sixth Amendment Right to Counsel

The defendant argues that his waiver of *Miranda* rights prior to giving a third statement did not waive his Sixth Amendment right to counsel, which attached when the court arraigned him. The state responds that the defendant did not make a clear and unequivocal assertion of his right and that his *Miranda* waiver sufficiently waived his Sixth Amendment right to counsel.

Both the United States and Tennessee Constitutions guarantee an accused the right to counsel upon the state's initiation of adversarial judicial proceedings. *See* U.S. Const. amend. VI; Tenn. Const. art. I, § 9. In Tennessee, an arrest warrant, or a preliminary hearing if no arrest warrant is issued, or an indictment or presentment when the charge is initiated by

the grand jury, marks the initiation of criminal charges to which the Sixth Amendment right to counsel attaches. *State v. Mitchell*, 593 S.W.2d 280, 286 (Tenn. 1980). When a defendant challenges the admissibility of a statement based upon the infringement of his Sixth Amendment right, the state bears the burden of showing that the defendant made a knowing and voluntary waiver of his right to counsel. *See Brewer v. Williams*, 430 U.S. 387, 404 (1977). In *Patterson v. Illinois*, the United States Supreme Court held that "[s]o long as the accused is made aware of the dangers and disadvantages of self-representation during post[-]indictment questioning, by use of the *Miranda* warnings, his waiver of his Sixth Amendment right to counsel at such questioning is knowing and intelligent." 487 U.S. 285, 300 (1988) (internal quotations omitted); *see also State v. Rollins*, 188 S.W.3d 553, 566 (Tenn. 2006).

The defendant contends that *Michigan v. Jackson*, 475 U.S. 625 (1986), operates to bar the admission of the defendant's third statement because the police initiated the interview.[3] However, the United States Supreme Court recently overturned that decision in *Montejo v. Louisiana*, — U.S. —, 129 S.Ct. 2079, 2090 (2009). In *Montejo*, the court held that the prophylactic rules protecting the defendant's choice not to speak to police outside the presence of his attorney were sufficient to protect the defendant's choice after the Sixth Amendment right to counsel attached. *Id.*[4]

In this case, Sergeant Harris advised the defendant of his *Miranda* rights prior to each of the defendant's three statements, and a general sessions judge advised him of his Sixth Amendment rights at his arraignment, which occurred immediately prior to his third statement. The defendant signed a form waiving his *Miranda* rights prior to giving each statement and never requested an attorney. The trial court found that his waiver was knowingly, freely, and voluntarily given, and the record does not preponderate against the trial court's findings. We conclude that on March 13, 2007, the defendant effectively waived his Sixth Amendment right to counsel by signing a waiver of his *Miranda* rights, and his

---

[3] In *Michigan v. Jackson*, the United States Supreme Court held that "if police initiate interrogation after a defendant's assertion, at an arraignment or similar proceeding, of his right to counsel, any waiver of the defendant's right to counsel for that police-initiated interrogation is invalid." 475 U.S. 625, 636 (1986).

[4] In *Miranda v. Arizona,*, the court held that a defendant subjected to custodial interrogation had the right to request that an attorney be present during the interrogation and to be advised of that right. 384 U.S. 436, 474 (1966). Under *Edwards v. Arizona*, once a defendant requests an attorney, all interrogation must cease unless the defendant initiates communication. *Edwards*, 451 U.S. 477, 484-85. "[U]nder *Minnick*'s prophylactic protection of the *Edwards* right, no subsequent interrogation may take place until counsel is present, 'whether or not the accused has consulted with his attorney.'" *Montejo*, 129 S.Ct. at 2090 (quoting *Minnick v. Mississippi*, 498 U.S. 146, 153).

subsequent statement was admissible against him at trial. *See Rollins*, 188 S.W.3d at 566. The defendant is, therefore, without relief as to this issue.

## Conclusion

Based on the foregoing reasons, we affirm the judgments of the trial court.


_____
J.C. McLIN, JUDGE